Manatoba v. Draeger Medical, Inc. The next case for argument this morning is 14-1713, University of Manitoba v. Draeger Medical. Give everybody enough of a chance to get settled. Let's give our credits. Okay. Mr. Summerfield, when you're ready. Good morning. The inventors of the 350 patent discovered that the provision to a surgical patient of biological fluids in a form that is monotonous, both in terms of rate and periodicity, is detrimental to the patient's health, or can be, because that does not emulate the way patients normally function. Therefore, as their discovery, they introduced variability into the provision of these surgical fluids in order to make sure that there was an emulation of the way that the patients normally function. Can I ask this question, and this may be more of a medical question than a patent question. If the object of this fluid delivery system is to produce something like, to emulate, as you say, what a patient not needing aid would be getting, how is it possible for the delivery not to take into account patient efforts, so that your view is that the claim is to be construed so that the delivery of the fluid is patient-independent, same volume and rate of fluid delivery, whether or not the patient is endogenously contributing some of the fluid delivery? Isn't the net effect of that not to emulate, but in fact to depart from what would be happening in a healthy patient? Actually, Your Honor, that isn't our position at all. We're saying there are two circumstances that can be involved, one in which a patient isn't breathing at all, which is clearly covered by the claims, and one in which the patient does contribute breathing. So the device has to take into account whether there is patient breathing or not, and the variability is intended to provide a variability to whatever gas or fluid is provided to the patient. So if the patient is breathing somewhat, the variability will take into account that fact and will not provide the patient more oxygen or blood than the patient can possibly handle. And if the patient isn't breathing at all or isn't supplying any of the blood, then that variability will be introduced to the provision of the 100% of whatever the oxygen or blood is that's being provided to the patient. What's the purpose of the limitation then? I'm confused. I assume that you would maintain the same variable flow irrespective of whether the patient was breathing or not. No, the variability, so if we look at a sinusoidal waveform, the periodicity and volume will vary whether or not the patient is contributing. In other words, you do not want a monotonous waveform. So if the patient is providing this much of the effort in one cycle, the added gas may be some discrete amount. That's what I thought. I just want to make sure I'm understanding. So if there was no patient effort, and I'm just going to use a really ridiculously simple example, if there was no patient effort, you'd be having a wave going up and down like 10 marks on a graph. If the patient was breathing, you might go up 11 or 12. Am I understanding this correctly? In other words, you'd have a combination of the flow coming from the device and the flow coming from the patient? That would vary if we look at the peaks of each waveform. Yeah. The peaks will be different. That's where the variability would come in, as will the periodicity of the waves. It doesn't adjust itself to take into account what the patient is doing. The flow is the same regardless of whether the patient is breathing or not. The peaks and valleys on the graph are going to be different. If I understand the question, no, Your Honor, there will have to be some account taken, because obviously a machine cannot vary to an extent that a patient is given more air than is supposed to hold. Well, that's where I'm confused, then, because I thought the limitation is there's no patient effort. In other words, isn't that what you disclaimed? Your flow is going to be the same whether the patient makes an effort or not. No. What we're saying, Your Honor, and I'll get into this when I talk about the prosecution history, but the purpose of the distinction over the prior art was that the prior art said, well, if a patient is providing this much effort, we are going to add an additional increment to ensure that every single time you have a target volume provided to the patient. In other words, the provision of the volume is monotonous. The patient will get the same amount of oxygen every single time. That's where the monotony comes in. The volume received should be the same. That's what the prior art said. And it can come from two things at least, your machine and the patient. That's certainly what the prior art said, that the volume. I think we're all talking about the same confusion, or at least it's my confusion. In the prosecution history, you've distinguished Stawicki, is it? Stawicki, yes, Your Honor. On the ground that that system varied the exogenous contribution, the machine contribution, according to whether the patient was providing some contribution of his own, and yours doesn't. Yours provides the same machine-supplied contribution based on a predetermined pattern from studies of animals or whatever, and that the machine does the same thing regardless of what the patient is doing. Is that not right? That was not what the prosecution history said, Your Honor. If we actually look at, it's actually replicated at page 817 of the opinion. And it says a couple of things. The first part is the Stawicki reference is concerned primarily with the weaning type of ventilator wherein gas flow to the patient is controlled in accordance with a pressure volume control law to ensure the delivery of a target volume to the weaning patient while taking into account patient effort. What this is saying is that we have a monotonous provision of this target volume, albeit in conjunction with whatever the patient is contributing. And then it says in the absence of patient effort, so we go on to talk about what happens under Stawicki if there is no patient effort, the system described by Stawicki will deliver a monotonously regular title volume and respiratory rate according to the preset values programmed by the operator. So whether the patient is breathing or not under Stawicki, you have this monotonous provision of surgical fluids. That's what's being distinguished in the 350 patent, not whether the patient is breathing or not. I must say, I read this to be, I mean, something like the opposite of what you just described, that your distinction of Stawicki was that it adjusts the amount coming out of the machine to take into account whether the patient is delivering some of his own fluid. And so the machine contributes less than it would if the patient is not making a contribution, the object being that the sum of the two contributions shall be the right sum, getting the correct either sinusoidal wave, but it says to get the net receipt, our machine contribution will be adjusted to take into account what the patient is doing for himself. And you're saying, we don't do that. Our machine gives the same contribution independent of anything that the patient is doing. Only in the event that the patient isn't breathing at all, Your Honor. I mean, if we have a situation where the patient is breathing, there has to be some account taken of that patient breathing effort. But how is that different from Stawicki then? Because Stawicki says that whether the patient is breathing or not, we are going to provide this monotonous sinusoidal waveform. We are going to make sure that every so often, with a regular periodicity, we are going to make sure that this patient... Well, wait a minute. It says in the middle of that first paragraph, you're reading from, the Stawicki system provides for a variable degree of assistance depending on the degree of patient effort. For a target volume, i.e., you're getting a target volume that's preset by the operator to provide for the same amount of oxygen to the patient every single time. Right. And then how is the 350 patent different? Because it says, at the end of the day, whether the patient is breathing or not, we are going to get a non-monotonous waveform. There will be X volume provided in one period, there will be Y volume provided in another, and Z in another. So the novelty is that it's a non-monotonous waveform. Correct. That's exactly right, Your Honor. And the whole point is this. What the inventors found out was patients don't breathe with regularity, both in terms of timing and volume, over and over and over again. So if they're undergoing a surgical procedure where what you're providing to them is surgical fluids based on the same volume every 30 seconds... Now you're saying the novelty is that it's not monotonous, and you're saying that, like Steadwicki, the patient effort doesn't matter because you're adjusting to the patient effort as it goes along. So what was the point of the limitation, then, about no patient effort? Why did you agree to that? We didn't, Your Honor. There is no limitation in the claim that say no patient effort. Well, except there's this piece of the prosecution history that says it quite clearly, right? In the absence of the present invention... I just lost my... In the present invention, there is no patient effort to be taken in consideration, and the variation in respiratory rate and tidal volume is predetermined for a patent taken. That's what you were arguing was the distinction between your invention and the prior art. Your Honor, we believe if you read the entirety of that passage, what it's really talking about is the distinction between a monotonous provision of surgical fluids versus something that varies the provision of those fluids, whether patient breathing is involved or not. That's what the entirety of that paragraph is intended to distinguish. Because if we actually look at what was added to get around Steadwicki, controlled life support conditions, what Drager would have the court believe is that that was added because no patient effort was to be taken into account. But if we look at the language, controlled life support conditions, that doesn't do the trick if that's really the distinction that the applicant was intending to interject. Because one can imagine a situation where the patient is providing 10% of the oxygen and a machine is providing the other 90%. There can't be much argument that that would be a controlled life support condition. The patient would die if the patient didn't get this 90% of the oxygen from the machine. Well, I don't think anybody's arguing, nor did the district court, conclude that the language in the claims was absolutely clear and dispositive here. I mean, he relied on, he or she relied on the prosecution history to find it right. The question is whether or not, given the no dysfunction of claims and prosecution history and we rely on this, you're saying that this was misread. People are taking, yeah, you're right, one sentence may be out of context, but the sentence seems quite clear. So it's just really hard to know what to make of this. Well, Your Honor, that's why this court has admonished over and over again that we don't read sentences from the prosecution history in isolation. We have to read the entirety of the prosecution history. And we also have to read the specification. What does the specification say? Well, your position isn't that if you read the entirety, it's absolutely crystal clear what's going on here, is it? Oh, yes, it is, Your Honor. We make it very clear in the prosecution history that the distinction in Stewitke and Bloom is that in those two references, you're talking about the monotonous provision both in terms of time and volume, surgical fluids to a patient. And that this invention varies that up to serve the needs of a patient to emulate that patient's normal bodily functions. That's the whole purpose of this invention, Your Honor. The whole purpose of the invention is clear. Is there anything you can point us to in the specification that gives us guidance or informs this analysis? Yes, Your Honor. As a matter of fact, the district court noted on page 815, it talks about, let's see. If we look at page 879, column 1, lines 48 to 50, it talks about alterations and gas exchanges being demonstrated in healthy patients being ventilated during elective surgery. Those patients are capable of... Hold on, hold on. You're ahead of me. Okay, 879. 879, column 1, lines 48 to 50. Okay. It talks about these alterations and gas exchanges being demonstrated in, quote, healthy patients being ventilated during elective surgery. Even the district judge said it's pretty clear that some of those patients, at least, are capable of breathing on their own. Then, if we actually look at another embodiment, which appears at page 880, column 3, and this is at lines 29 through 32, it says the principles of the invention may be used in intra-aortic balloon counterpulsation, or IABC, the techniques used to support patients usually following CPB, cardio bypass surgery, when they are unable to maintain adequate cardiac output. Not no cardiac output, but adequate cardiac output. So these patients are actually able to pump some blood, just not enough. And this invention applies to providing additional blood to them. And because the claims are talking about biological fluids and not just oxygen, it would be illogical to say, well, the claims don't take into... There can't be any patient breathing when we're talking about that aspect of biological fluids, but if we're talking about blood, the patient can have some heart activity pumping some blood. You have to construe these limitations to be the same. So whether you're talking about oxygen or whether you're talking about blood, they're both biological fluids, and the patent very specifically contemplates situations where the patient would be providing some of that. I'll reserve the rest of my time for rebuttal. You've got very little. We'll go two minutes at a time. Thank you. I'm not sure what proposed definition Palin is proposing now. He had one at the lower court hearing. He proposed one in his reply brief. I'm not sure what his current proposal is. The proposal on record was fundamentally the primarily argument. So I'm not sure, although he's trying to make some points, I'm not sure what the ultimate point is here. The reason we're here, I thought, was irrespective of, even if he says plain and ordinary meaning, we're not really talking about the definition of the term in the claim. We're relying on, we're almost now trying to interpret the prosecution history in this case. So why don't you tell us why his argument, with regard to the prosecution history, doesn't have some weight if you read the provision in its entirety. Sure. And as part of that, can you point us to where, if anywhere, in Stowiki, Stowiki shows a non-monotone waveform machine supply of fluid? Yes. But before I do that, as part of that, as a first point, let me say this. The plaintiff or appellant was arguing this was the point of the invention. And he says a non-monotonous volume. He keeps talking about volume. He distinguishes Stowiki on the basis of it has a monotonous volume. The truth is, Stowiki, if we look at Stowiki, which is 792. It is. Yes. If we go to the page 802, the first page, the column 1 of the specification. At the bottom of the page, on line 65, column 1, it says a prime concern of any ventilator is accommodation to patient effort. And that's a ventilator that's operating, as we said, ventilators can operate under two principles. Either they accommodate patient effort or they don't. And the programmer has to choose which software is going to run. Are we going to accommodate any patient effort or are we not? This Stowiki patent was a patent defined or designed to accommodate patient effort. And it says accommodation to patient effort. Now, here's the term picked up by the patentee in his arguments during prosecution. Accommodation to patient effort, or control by the patient, is defined primarily as synchronization. We're editing from now. Same continuation, line 66. Is defined primarily as synchronization of the ventilator's inhale and exhale phases with the phases of the patient's effort. The whole discussion earlier, almost all of it, was about the volume. Monotonous volume. Monotonous volume that makes up the difference. But the truth is, in his prosecution history, the patentee says, the distinction here, there's going to be a couple of things, is that we wholly control, in our invention, it says Stowiki was an assisted ventilation. In ours, we wholly control rate and volume. And Judge Fogle asked the question, isn't this just running a predetermined pattern? And exactly what it is. All the examples show where they took a mammal, in this example a dog, put it under and just recorded its natural rhythms of volume and rate. And rate's very important. Stowiki is going to synchronize the timing of the inhale and exhale. And in the First Amendment, the patentee relied on this control of the rate and the volume. Ten times they mentioned rate and volume, the control, and the predetermined pattern of rate and volume. In the Second Amendment, the distinction bloomed. They still said ten times they referred to the rate and volume control. But the predetermined pattern and the rate of control is only part of the First Amendment. The First Amendment had two amendments. In the first instance, they said we're going to distinguish Stowiki on the basis of controlled life support conditions. And then they said, in contrast to Stowiki, we are not in controlled life support conditions. And then they said, even with Stowiki, even on that distinguishing point, we're going to make the pattern predetermined. And so the arguments, if you look at the First Amendment, clearly had a first set of arguments about controlled life support conditions where they defined it. And then the second thing where they discussed the pattern and the monotonous tones. And if we read the full quotes from the prosecution history, and not the ones from the court's brief, if we turn to that, that is at page, let's start here. We're going to get to A607. So just as they started, as Patty started on A607, about the 1, 2, 3, 4th paragraph, the present invention is concerned with controlling the flow of biological fluid to an organ during controlled life support conditions. And then it says the species is one which wholly controls the flow of ventilating gas. Let's turn to page 4, or page 608, the next page, the first full paragraph. The Stowiki device is relied on by the examiner. It's concerned primarily with the weaning type of ventilator which provides assisted ventilation to a patient rather than the present invention, which is concerned with ventilation during controlled life support conditions. He's drawing a distinction of the treatment conditions, the circumstance of the patient here. And this is, to grasp the seriousness of his amendment, in the First Amendment, he added controlled life support conditions to three out of the four paragraphs of Claim 1. He added predetermined to describe pattern in only one of the elements. I mean, this was a very significant amendment that he made, and his arguments speak to that. And let's just, with the earlier discussion, the earlier case, I think, talked about the disjunctive or conjunctive. And let's show that he actually links his two arguments. He has a first argument and a second argument that he relies on, just as he had a First Amendment and a Second Amendment. Can we say that this device wouldn't work if the patient was breathing? That the claim device. The claim device, right. The claim device, I don't see any way it would work. Stowiki says when the patient's breathing, the examples in the patent show they take a recording, and the example I said, I think they looped it all these times. It was pretty clear that it certainly is meant to work in a situation where a patient's not breathing. So you're creating the, you're mimicking the breathing of a mammal as opposed to a monotonous flow. That part I get, but where does it say in there that it wouldn't work if there was patient effort? Well, let me say this. First of all, there's another question related to that, which is Stowiki has much disclosure about how to accommodate patient effort. All the software and all the disclosure here, there's never a teaching to one of ordinary skill in the art how to accommodate patient effort in the 350 patent. Every example that's run is how to, they actually control both rate and volume. If you dictate the rate, you are not accommodating the patient's initiation of inhalation and exhalation. You just can't do it if you're controlling, if you're holding controlling. Ten times they use those conjunctive terms. Now look, if I may, quickly, page five, or page 609, and again, after talking about Stowiki, it says this operation is quite different from the operation of the present invention where the ventilators operated during controlled life support conditions and not under weaning conditions. So that's his first point. And in which he has first established a predetermined pattern. Plaintiff has talked about predetermined pattern through all this time. And he omits, conveniently, all the discussion about the distinction in controlled life support conditions of an assisted, he says, Stowiki is an assisted, ours is a controlled. He used controlled life support conditions. In the patent, he says, oh, column one, there's a disclosure of, it says, assisted life support conditions and another thing with healthy conditions. But even there, they're consistent. The critically ill patients are under life support. Note the claim term. Controlled life support conditions. The healthy patients, he doesn't say they're under life support. They're just healthy patients who may be. The truth is, also, even if the, I don't think there's any disclosure about healthy patients and whether they're breathing or not. We don't know what a healthy patient is. We don't know what elective surgery is. I had my hip replaced. It was elective, but I believe I was out and somebody was controlling my breathing during the surgery. But even if there was an explicit preferred embodiment in the specification teaching a circumstance where there could be breathing under something, the specification does not limit the invention. The claims limit the invention. Frequently, the claims do not cover even preferred embodiments in the specification. You can just claim preferred embodiments. Whether or not this thing actually described healthy patients under process of this process, I don't see how the process could ever work if you dictate the rate and the volume with the patient who's trying to breathe on his own. Right, because without taking into account what the patient is doing, the patient may be out of sync with whatever the sinusoidal wave is, or it may be in sync, but contributing peaks that are way too high. The wiki talks about a problem of fighting the ventilator, it calls it, where you're not in synchronization and where a patient wants to breathe and the ventilator's in an opposite phase or something like that. And a lot of damage to the lungs when you fight it. Can you answer the question I asked you to address about the wiki, where it describes a waveform contribution? And the answer may be it is inherent in inhale, exhale, inherent in tidal, inherent in some other things. The abstract refers to waveform. But can you point me, because there was some mention during your friend's opening argument about the distinction being between his invention and Stawitki, that Stawitki provides a monotonous contribution by which I took to mean a constant rate of fluid, no ups and downs, not sinusoidal. I'm trying to put my hands on where Stawitki is in my exhibit list. It's 792 in the appendix. Thank you very much. Stawitki has examples, and I don't believe I'm going to point quickly to them, where it accommodates different events that occur with the patient. For example, if the patient coughs. Right, let me try that. This may be confusing. You could have a monotonous flow produced by taking into account at every single instant what the patient is doing and subtracting that from the amount you're going to contribute, but that the net contribution is constant. I took the word monotonous that he was using to mean that. Maybe I took it wrong. It would not look like inhaling and exhaling. There would be no down period of net intake, which strikes me as odd, but I'd like you to show me in Stawitki where Stawitki contemplates that after taking into account any patient contribution, what the patient is getting looks sinusoidal. Or anything but monotonous. I believe... And you're only speaking about monotonous in terms of volume, not in terms of rate. I think his claim requires both monotonous, control of both. Do you see, Dusty, the discussions... Do you happen to know how to interpret on page 800, figure 11B? That looks like a waveform to me, but maybe it's not a relevant waveform. It doesn't look like it's monotonous, if it is. It's only a volume. It's volume over time, but it shows that the different breaths had different... That's okay. I'm just sorry. I don't... I'm just not sure if you're trying to find out whether Stawitki actually teaches at the end point of inhalation, varying the volume of the patient from breath to breath, the ultimate, what we call tidal volume, the volume that's received by the patient, whether by his own effort or by the machine. I'm not sure if that's your question. The degree of assistance changes, diminished as elasticity changes, the pressure changes. It controls it by varying the pressure to reach oxygenation. I think it talks... I don't have the exact site. I think it talks to minute volume, which monitors how much the patient was getting, if the patient fought or coughed or did something. It tracks over a minute, not just breath to breath, but they say, well, this patient needs X amount of volume, minute volume per minute. Then we're going to make up more, depending on what they've already done, we'll make it up to ensure that the average for the minute, the minute volume, will meet the prescribed oxygenation rates. And quite frankly, I just didn't contemplate that question here. That's fine. Thank you. Thank you. I'm colorblind, but I think my time is up. Is that correct? Yes, sir. Thank you. Thank you. What Mr. Jones said last is my point exactly. STWIKI is intended to make sure that a patient gets a target or prescribed volume of oxygen, in addition to whatever the patient has provided. So if we look at page 808, this is STWIKI, and we look at column 13. This is describing one of the equations that STWIKI implements. Thus, for breaths with added resistance, which is... Where on column eight? I'm sorry, line five, column 13, line five. So this is the resistance that Mr. Jones was talking about. Thus, for breaths with added resistance, if patient efforts cause the actual flow rate, DV over DT, to be less than the prescribed rate, flow target, then the pressures to the patient are increased. Similarly, when the patient causes the actual flow rate to exceed flow target, the applied pressures are diminished. The point is that STWIKI wants the patient to get the same volume of air, taking into account however much the patient is breathing. That is different than the 350 patent, and that was the distinction made in the prosecution history. Now, as far as no embodiments that Mr. Jones said that taught patient assistance, as I mentioned before, IABC, which does talk about blood, but that is part of these claims, talks about the patient providing inadequate blood flow. So that is a circumstance where this invention is intended to work with a patient's efforts, not independent of them, not ignoring them. So the patent very clearly enables someone to take this invention and apply it where the patient is able to provide some of his own surgical fluids. Thank you.